NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

JAC 15-836

STATE IN THE INTEREST OF J.M.B.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 25757
HONORABLE LILYNN ANNETTE CUTRER, DISTRICT JUDGE

**********

DAVID KENT SAVOIE
JUDGE

**********

Court composed of Marc T. Amy, Billy Howard Ezell, and David Kent Savoie, Judges.

AFFIRMED.

**Nick Pizzolatto, Jr.**
**Attorney Supervisor**
**Bureau of General Counsel**
**Louisiana Department of Children & Family Services**
**1919 Kirkman Street**
**Lake Charles, LA 70601**
**(337) 491-2470**
**COUNSEL FOR APPELLEE:**
    **State of La., Department of Children & Fam. Services**

**Larry E. Pichon**
**330 Alamo St., Suite G**
**Lake Charles, LA 70601**
**(337) 439-3073**
**COUNSEL FOR APPELLANT:**
    **D. A. B. (mother)**

**Amy E. McGray**
**MHAS/Child Advocacy Program**
**1 Lakeshore Dr., Suite 1585**
**Lake Charles, LA 70601**
**(337) 491-2461**
**COUNSEL FOR APPELLEE:**
    **J. M. B. (child)**

**SAVOIE, Judge.**

The natural mother of a minor child appeals the trial court's judgment terminating her parental rights. For the reasons that follow, we affirm.

<u>Procedural Background</u>

In its extensive written reasons for judgment, the trial court set forth the procedural history of this matter as follows:

On August 10, 2010, the State of Louisiana, Department of Children and Family Services (hereinafter referred to [as] the State), received a report that [D.B.][1] . . . had given birth to [J.M.B.] . . . , and he was ready to be discharged from the hospital. [J.M.B.] was born on June 18, 2010 [at approximately 27 weeks gestation]. While there is no father listed on [J.M.B.]'s birth certificate, [D.B.] identified [D.S.] . . . as his father. [D.B.] had a history with the State removing her other five children from her care due to her mental illness which prevented her from safely parenting her children. As part of her case with her other children, Dr. John Simoneaux had evaluated her and recommended that no children be placed with [D.B.] Accordingly, the State sought an instanter order from the Court which was granted on August 12, 2010.

A petition was filed by the State (Docket No. 23478) on August 17, 2010, alleging that [J.M.B.] was a neglected child in need of care. At the continued custody hearing on this same date, the court ordered [J.M.B.] to be continued in the State's custody and denials were entered to the petition and a trial fixed for September 10, 2010. At trial, [D.B.] stipulated that [J.M.B.] was a child in need of care, without admitting to the allegations, and the Court adjudicated him a child in need of care. On October 8, 2010, the case plan was accepted by the Court with a goal of reunification and all parties were ordered to comply. Case and dispositional review hearings were held on November 19, 2010[,] and May 24, 2011. At the hearing on October 6, 2011, the Court accepted the recommendation of the State to change the case plan goal from reunification to adoption for [J.M.B.]

On November 17, 2011, the State filed a "Petition for Certification for Adoption and Termination of Parental Rights (Docket No. 24506)," seeking to terminate [D.B.]'s and [D.S.]'s parental rights to [J.M.B.] The trial started on April 3, 2012. After hearing some testimony, the Court recessed the proceedings. With the concurrence of all parties, the Court issued an order for the State to schedule an appointment for [D.B.] with Dr. John Simoneaux so he could update his previous psychological evaluations of [D.B.] The Court further ordered [D.B.] to submit to the appointment and cooperate with Dr. Simoneaux. The trial was refixed to June 21,

---

[1] Initials are used in this matter pursuant to Uniform Rules, Courts of Appeal, Rules 5-1 and 5-2.

2012, at which time the State dismissed its petition to terminate [D.B.]'s parental rights.

Case reviews continued to be held [in connection with docket no. 23478] on June 21, 2012, August 21, 2012, December 4, 2012, March 8, 2013, July 10, 2013, and March 5, 2014. On August 1, 2013, the State filed a "Second Petition for Certification for Adoption and Termination of Parental Rights [docket no. 25757]," seeking to terminate the parental rights of [D.B.] and [D.S.] to [J.M.B.] The State alleged that [D.S.] had never worked a case plan and disappeared. They further alleged that . . . [D.B.]'s pattern of behavior clearly demonstrates there has been no significant compliance with her case plan and no reasonable expectation of compliance in the near future, given the age of [J.M.B.] and his almost three years in foster care. [D.B.] answered the petition on August 23, 2013, denying the allegations and arguing that she has complied with her case plan. After several continuances due to different reasons (i.e. [D.B.]'s desire to obtain another updated evaluation with Dr. John Simoneaux, a freezing winter storm, Dr. Simoneaux's unavailability, Dr. Simoneaux's surgery), the trial was conducted on October 14 and 29, 2014, and concluded on May 15, 2015.

. . . . At the conclusion of evidence on October, 29, 2014, the Court granted judgment terminating the parental rights of [D.S.] to his son [J.M.B.] After the conclusion of trial on May 15[,] 2015, the Court took the issue of terminating [D.B.]'s parental rights to [J.M.B.] under advisement to review all of the testimony and documents.

On July 13, 2015, the trial court rendered judgment in connection with the State's second petition for certification of adoption and termination of parental rights (trial court docket. no. 25757). The trial court terminated both D.S.'s and D.B.'s parental rights as to J.M.B., ordered that J.M.B. remain in the State's custody, and certified J.M.B. as eligible for adoption. D.B., the natural mother, has appealed the judgment rendered in trial court docket number 25757.

On appeal, D.B. asserts that (1) the evidence presented was insufficient to terminate her parental rights under La.Ch.Code art. 1015(5); (2) there was error in not returning J.M.B. to D.B. after the State dismissed its first petition seeking to terminate her parental rights (trial court docket no. 24508), and in not assisting D.B. with finding suitable house; and (3) the trial court erred in not giving written reasons for a March 20, 2013 judgment in the Child In Need of Care ("CINC")

2

proceedings (trial court docket no. 23748) that rejected a case plan dated February 4, 2013, with a permanent goal of reunification.

## ASSIGNMENT OF ERROR 1:

### Burden of Proof and Standard of Review:

Louisiana Children's Code Article 1015(5) provides the following as a ground to terminate parental rights:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Lack of parental compliance with a case plan as required by La.Ch.Code art. 1015(5) may be evidenced by one or more of the following:

> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
>
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
>
> (6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
>
> (7) The persistence of conditions that led to removal or similar potentially harmful conditions.

La.Ch.Code art. 1036(C).

In addition, La.Ch.Code art. 1036(D) states:

Under [La.Ch.Code] Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

In *State ex rel. D.H.L.*, 08-39, pp. 4-5 (La.App. 3 Cir. 4/30/08), 981 So.2d 906, 910 (footnotes omitted), we discussed the State's burden of proof and our standard of review in connection with termination of parental rights proceedings as follows:

> Our supreme court has recognized that the gravity of terminating parental rights requires our courts to impose a stricter standard of proof than the preponderance of the evidence standard; rather, the State must prove by clear and convincing evidence at least one of the statutory grounds contained in La.Ch.Code art. 1015 in order to terminate a parent's rights. *See State ex rel. J.M.*, 02-2089 (La. 1/28/03), 837 So.2d 1247; La.Ch.Code art. 1035(A). "Further, even upon finding that the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines that to do so is in the child's best interests." *State ex. rel. J.M.*, 837 So.2d at 1253; *see also* La.Ch.Code art. 1037(B).

> An appellate court cannot set aside a juvenile court's findings of fact regarding the termination of parental rights unless it is manifestly erroneous or unless those findings are clearly wrong. *In re A.J.F.*, 00-948 (La.6/30/00), 764 So.2d 47; *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

In *In the Interest of CLS*, 94-531, pp. 5-6 (La.App. 3 Cir. 11/2/94), 649 So.2d 532, 536 (internal citations omitted), we explained:

> Proof by clear and convincing evidence requires a party to persuade the trier of fact that the fact or causation sought to be proved is highly probable, i.e. much more probable than its non-existence. This burden is an intermediate one between the burden of proof by a

4

preponderance of the evidence and the burden of proof beyond a reasonable doubt.  Proof by clear and convincing evidence requires more than a "preponderance" of the evidence, the traditional measure of persuasion, but less than "beyond a reasonable doubt," the stringent criminal standard.

**Case Plans:**

A case plan dated September 8, 2010, which indicated the State's permanent plan goal of reunification, was accepted by the trial court in its November 3, 2010 judgment in connection with the CINC proceedings (trial court docket no. 23478). It provided the following goals and requirements for D.B: (1) A support system that was reliable and substance free; (2) Maintaining a safe and stable environment for her children, which included securing a comfortable and safe home and paying child support as ordered; (3) Becoming stable on medication to control depression and borderline personality disorder; (4) Being drug free; and (5) Increasing her knowledge and parenting skills regarding general child care and supervision.  It also set forth specific action items for each goal.  A similar case plan dated February 8, 2011, which also reviewed D.B.'s progress, was approved by the trial court in its judgment dated June 13, 2011.

Pursuant to a case plan dated August 22, 2011, and approved by the trial court on October 18, 2011, D.B. was specifically ordered to pay child support in the amount of fifty dollars per month in connection with the case plan requirement of maintaining and safe and stable environment for her children, and the State's permanent plan was changed to adoption.

On August 14, 2012, the trial court rendered a judgment approving a case plan changing the State's permanent case plan goal back to reunification. However, pursuant to a March 20, 2013 judgment, the trial court rejected a similar case plan dated February 4, 2013, with a goal of reunification, and ordered re-staffing of the case.

A case plan dated May 1, 2013, and approved by the trial court on July 23, 2014, lists the permanent case plan goal as adoption. A similar case plan dated February 25, 2014, was accepted by the trial court on March 11, 2014, and this is the last case plan in the CINC proceedings record.

**Trial Court's Findings**

In connection with the instant matter, the trial court provided extensive written reasons for terminating D.B.'s parental rights under La.Ch.Code art. 1015(5). After reviewing and thoroughly discussing the evidence presented, the trial court concluded that the elements required for termination of parental rights under La.Ch.Code art. 1015(5) were proven, stating as follows:

> There is no dispute that . . . [J.M.B.] has been in foster care since August 12, 2010, a period far in excess of one year at the time of filing of this second petition to terminate parental rights. Thus, the first element of *La. Ch. C. art. 1015(5)* . . . has been met.
>
> . . . .
>
> This case has been very long and drawn out due to [D.B.] making some progress on her case plan and the extra time and efforts given to her to complete her case plan. . . . It is now almost five years down the road and [D.B.]'s case plan should be completed, given the extended period of time she has had to complete it. The State maintains that her case plan is not complete because she has failed to make parental contributions to the support of [J.M.B.] In addition, the State raises concerns regarding her completion of her case plan goals because she does not understand the needs of her son and has little attachment to him.
>
> . . . .
>
> Despite her completion of most components of her case plan, after almost five years of [J.M.B.] being in the State's care, [D.B.] has failed to complete her case plan goals of supporting [J.M.B.] by paying her parental support obligation. In addition, [D.B.] has blatantly violated the law filing tax returns claiming children for whom her rights were terminated and/or children not in her care. In addition, [D.B.] does not have the ability or capacity to understand and recognize the needs of her child having been in multiple placements initially while in State care until placement with [the current foster family]. Her failure to know her child's needs and facilitate the transition necessary for him evidences to the Court lack of any reasonable expectation of improvement in the future. D.B. continues to lack substantial improvement in redressing the problems

6

preventing her reunification with J.M.B. Thus, conditions which led to J.M.B.'s removal still exist. The Court further finds that the State met its burden of proof as to the third element of [La.Ch.Code art. 1015(5)], the lack of any reasonable expectation of significant improvement in the parent's conduct in the near future.

[Louisiana Children's Code Article 1015(5)] also requires the Court to consider "the child's age and his need for a safe, stable, and permanent home." In this particular case, this consideration has significant relevance for the following reasons. [J.M.B.] was initially removed from his parents when he was discharged from the hospital at approximately two months old. He has never lived with his mother, but instead resided in foster care for almost five years. [J.M.B.] had five placements until he was placed with [his current foster family] in 2010. [J.M.B. has experienced attachment issues with his caregivers given the number of placements. [J.M.B.] is adjusted to the [current foster family's] home and it would not be in his best interest to be removed from the home of [the current foster family] whom he considers his parents and with whom he has lived most of his life. Given [J.M.B.]'s age, years in care and issues regarding attachment to care givers, his need for a safe, stable, and permanent home are undeniable.

In addition to finding that the requirements of La.Ch.Code art. 1015(5) were sufficiently established, the trial court also found that termination of parental rights was in J.M.B.'s best interest, stating as follows:

The decision to terminate the parental rights of any parent to their child is by far the hardest decision this Court makes in Juvenile Court. . . . The Court acknowledges [D.B.]'s efforts and her determination to have [J.M.B.] placed back in her custody. However, [J.M.B.] deserves to achieve permanency and stability, especially given the extended period of time he has been in the State's care and the attachment issues he has experienced by multiple placements.

Considering all of the reasons discussed above and focusing on [J.M.B.'s] best interests, the Court is convinced that his best interests would be served if his legal relations with his mother would be terminated. When the Court considers [D.B.]'s continued failure to support her child, as well as her inability to recognize the needs of [J.M.B.] if he were returned to her, the Court has serious concerns. In addition, [J.M.B.] has been placed with the same care givers . . . for almost three years. . . . The testimony was clear and strong regarding the attachment between [J.M.B.] and [his current foster family]. They are willing to adopt [J.M.B.] [J.M.B.] went through five placements before being placed with [the current foster family]. The testimony revealed the struggles that [J.M.B.] suffered, such as serious issues regarding attachment to care givers, due to these numerous placements.

7

Considering all the testimony and evidence presented, the Court is convinced that to remove [J.M.B.] from the only permanent home he has known for his entire life to place him with his mother would be extremely detrimental since she does not understand and/or recognize any problems that [J.M.B.] may suffer with the transition and since she is not willing to facilitate a transition that will be best for [J.M.B.] if it involves [the current foster family].

## Analysis:

On appeal, D.B. argues that the State failed to prove by clear and convincing evidence that she failed to comply with her case plan as required for termination under La.Ch.Code art. 1015(5) because (1) a DCFS worker, Ms. West, testified that, with the exception of parental support, D.B. had worked her case plan; (2) a dispute existed over what amount, if any, D.B. owed; and (3) D.B. can pay any amounts that are actually owed in the foreseeable future.

With respect to the trial court's finding that D.B. failed to pay support as ordered despite D.B.'s testimony to the contrary, the trial court discussed the following evidence:

[D.B.] has been employed at McDonald's for approximately two years. In addition, [she] has received significant income tax refunds that she could have used to become current on her support. The State acknowledged three payments by [D.B.] dated October 7, 2014, right before the termination trial, in the amounts of $500, $300, and $100. [D.B.]'s attorney also gave the State money order receipts at trial in the amounts of $100 (dated March 28, 2012), $100 (dated June 20, 2012) and $129 (dated November 2, 2012). However, the print out from the State Support Enforcement Office only showed that she paid $150 from August 2011 until August 2013. None of the above payments showed up on the State's print out. Further, the receipts do not indicate that the money orders were paid to the State for support of [J.M.B.] Nevertheless, even if [D.B.] was given credit for all of these payments, she would still not be current on her support obligation for [J.M.B.] Even more telling to this Court is that between October 29, 2014 and May 5, 2015, when the trial was concluded, [D.B.] did not make any payments for [J.M.B.]'s support. After the trial started and testimony was taken on October 14 and 29, 2014, she knew her payment of parental support for [J.M.B.] was a significant issue in her termination trial . . . . However, [she] failed to make any efforts to address this issue during the several months pending after the final trial date. Not only does that establish her failure to complete with her case plan, it gives this Court considerable concerns regarding her commitment to her child and any expectation that she will improve in this area in the near future.

We find that the record supports the trial court's conclusion that D.B. failed to satisfy her parental support obligation required by her case plan, as well as the trial court's finding regarding its lack of expectation that D.B. would improve in supporting or committing to J.M.B. in the future. Therefore the trial court's finding that D.B. failed to pay support as ordered is not manifestly erroneous.

Moreover, the trial court found a lack of compliance with the case plan for other reasons, stating as follows:

> Another area of testimony that gives this Court serious concern is the testimony regarding the transition of [J.M.B.] back into [D.B.'s] home should it occur. Dr. Simoneaux testified that there will be a risk to [J.M.B.] if he was moved back with his mother. He felt it would be a difficult transition for everyone involved because [J.M.B.] has not resided with his mother since birth. . . . He explained that [D.B.] would need to learn from [J.M.B.'s] foster parents, . . . what they know about [J.M.B.] In addition, it would need to be a slow transition. Dr. Simoneaux acknowledged that it would be concerning to him if [D.B.] told a counselor that she did not want to have any interactions with the foster parents.

> Sherry Royer, an expert LCSW with a specialty in child welfare and family services cases, testified that she was concerned with [D.B.]'s ability to recognize her child's needs. Mrs. Royer was especially concerned that [D.B.] did not understand or recognize the problems that [J.M.B.] could experience if he was transitioned from his foster parents' home to her home. Mrs. Royer explained to [D.B.] how [J.M.B.] had so many placements upon first entering foster care but he had finally been placed with [the current foster family] for over a year and that she worried about him having serious problems transferring to another caregiver if he was moved again. Mrs. Royer testified that [D.B.]'s response was only focused on herself and not [J.M.B.] [D.B.] said that she never had a chance to parent her child and she should be able to parent her child. [D.B.] was not able to recognize the concerns with the transitions and was not able to give any ways to make the transition better for [J.M.B.] [D.B.] felt that the State did her wrong by taking [J.M.B.] and the State should just give him back. She was not concerned about how to make that transition smooth for [J.M.B.] [D.B.] did not believe there would be any problems and stated they would be just fine.

> Given [J.M.B.]'s history of placement and attachment problems in the past, Mrs. Royer testified that she has concerns as to whether [D.B.] can put her needs aside and deal with the needs of [J.M.B.] She believes that moving [J.M.B.] at this time would be very detrimental to him. She explained that the research shows that every time a child has to develop a new attachment to a new caregiver, the

ability of the child to attach gets harder. . . . Mrs. Royer testified that removing him from his current home would be exteremely detrimental to [J.M.B.] She maintained that placing him with his mother would be tempting fate as he might be placed with someone who does not meet his needs.

The Court notes that when [D.B.]'s counselor was asked if she and [D.B.] discussed how [J.M.B.] would be affected if he was transitioned back into [D.B.]'s home given he had never lived with her during the four years of his life, she said [D.B.] just stated that the transition needed to happen because she had not seen him his whole life. It gives the Court concerns to know that after all the counseling that [D.B.] received to address her diagnosis of Borderline Personality Disorder that she was not able to understand the impact a change in homes could have on her child.

[I]f [J.M.B] was transitioned back to his mother, Mrs. Royer testified that [D.B.] would need to . . . allow the [current foster family] to have some visits after the transition so [J.M.B.] would know that he was not totally abandoned by the [current foster family]. [D.B.] was absolutely adamant that she would not allow this to happen. This was very disturbing to the Court, as it was to Mrs. Royer, especially given the struggles that [J.M.B.] has faced with attachment in the past.

The foster mother . . . testified that when [J.M.B.] arrived in June, 2012, he did not talk much. He was shy and timid and did not mingle with others. [J.M.B.] would grunt instead of using words to talk. Mrs. Royer also noticed the attachment issues in her sessions with [J.M.B., D.B., and the foster parents]. After various interventions such as play therapy and school interventions, [J.M.B.] has thrived and is very bubbly and happy. [J.M.B.]'s teacher also testified that he has improved at school.

The record reasonably supports a finding that the State sufficiently proved that [D.B.] failed to comply with the case plan by (1) failing to pay support as ordered; (2) failing to increase her knowledge and parenting skills regarding general child care and supervision; and/or (3) failing to substantially improve in redressing problems preventing reunification. Therefore, we cannot say the trial court's findings were manifestly erroneous.

## ASSIGNMENT OF ERROR NO. 2

D.B.'s second assignment of error is stated as follows: "There was error when the child was not returned to [D.B.] after the dismissal of the first termination of parental rights petition by not assisting [D.B.] in overcoming any

10

barriers to the placement [of] J.M.B." Specifically, D.B. suggests in her brief that she "was having issues securing her housing as she had to move[, and] the agency had a duty to try to assist her."

In response, the State and the MHAS/Child Advocacy Program on behalf of J.M.B. argue that the issue is not properly before this Court because (1) D.B. did not appeal the judgment relating to the trial court's dismissal of the State's first termination of parental rights proceeding (trial court docket no. 24506), which ordered J.M.B. to remain in the State's custody, and (2) D.B.'s parental rights were not terminated in the instant proceeding due to any inability to secure housing. We agree, and therefore we find this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 3

D.B. frames her third assignment of error as: "The trial court erred in not providing reasons for the rejection of the case plan goal of reunification" in connection with the trial court's March 8, 2013 order in the CINC proceedings (trial court docket no. 33478). No appeal has been taken in connection with any judgment in the CINC proceeding, and we fail to see how this purported error has any bearing on the trial court's judgment in the instant case that terminated D.B.'s parental rights. Therefore, this assignment of error also lacks merit.

## CONCLUSION

For the reasons set forth above, the trial court's judgment in this matter is affirmed. Costs of this appeal are assessed to Appellant.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules– Courts of Appeal, Rule 2–16.3.

11